# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MITCHELL J. SHERMAN,

        Plaintiff,

        v.                           Case No. 13-CV-1355

CATHY JESS, WARDEN PAUL KEMPER,
JASON ALDANA, LUCAS WEBER,
MICHAEL WITT, and KATHLEEN NABRZYSKI,

        Defendants.

## DECISION AND ORDER

The pro se plaintiff, Mitchell J. Sherman, is a former Wisconsin state prisoner. He filed this lawsuit pursuant to 42 U.S.C. § 1983 and was granted leave to proceed in forma pauperis on claims that the defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well as the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, et seq., while he was incarcerated at the Racine Correctional Institution. The defendants have filed a motion for summary judgment. For the reasons explained below, I will grant defendants' motion and dismiss this case.[1]

---

[1] Sherman has filed two responses to the defendants' summary judgment motion. On April 30, 2015, I granted in part Sherman's motion to compel discovery and gave Sherman a deadline on June 22, 2015, to file one, comprehensive summary judgment response. On June 23, 2015, Sherman filed a second motion to compel discovery (addressed at the end of this order) in which he states that his most current response to defendants' motion for summary judgment may stand as it currently is. (Dkt. No. 71 at 2.)

# I. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed, or is genuinely disputed, must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4).

## II. FACTS

### A. Parties and Claims

The plaintiff, Mitchell Sherman (Sherman), is a former Wisconsin Department of Corrections (DOC) inmate who was confined at the Racine Correctional Institution (RCI) at all times relevant. The defendants are: DOC Division of Adult Institutions Administrator Cathy Jess, RCI Segregation Captain Lucas Weber, RCI Warden Paul Kemper, Security Director Jason Aldana, Correctional Sergeant Michael Witt, and Correctional Officer Kathleen Nabrzyski.

Sherman alleges that the defendants violated his rights during two periods of segregation temporary lock-up (TLU) at RCI. The first TLU placement was from December 3 through December 18, 2012. Sherman alleges that he was not given a shower for five days, until December 8 and that, as a result, his eczema condition worsened, causing his skin to dry out, crack, and bleed, making his movements painful and labored. Additionally, Sherman alleges that he did not receive adequate ventilation and heating, which triggered chronic asthma attacks. Sherman further alleges that he did not receive his religious text or holy book while other inmates in TLU received theirs. Sherman's second placement in TLU was from February 15 until March 1, 2013. He allegedly did not receive his religious text or holy book during that time, but other TLU inmates received theirs.

Based on these allegations, Sherman is proceeding on a claim under RLUIPA, a First Amendment free exercise of religion claim, a Fourteenth Amendment equal protection claim, and an Eighth Amendment conditions of confinement claim. (Dkt. No. 11 at 3-4.)

## B. Exhaustion of Administrative Remedies

Sherman submitted an offender complaint on December 6, 2012, alleging that on December 3, 2012, he was placed in segregation and was refused the opportunity to shower until December 8, 2012; that he had not been provided adequate ventilation, his

3

holy book, a small comb, adequate clothing, writing materials or stamps; and that his asthma worsened and his eczema was aggravated due to the conditions. (Kemper Aff. ¶ 8; Rose Aff. Ex. 1001 at 8.) On December 12, 2012, Institution Complaint Examiner (ICE) Nancy Padgett returned Sherman's complaint to him because it contained "multiple issues he is having and unit as well as medical issues," in violation of Wis. Admin. Code § DOC 310.09(1)(3).[2] (Kemper Aff. ¶ 10; Compl., Ex. C, Dkt. No. 1-1 at 6.) Padgett instructed Sherman to follow the "chain of command" before resubmitting his offender complaint:

> The ICE would direct complainant to contact Captain Weber or Lt. Serrano regarding his unit concerns. The ICE would also direct complainant to contact the Health Services Unit regarding any medical issues.

> Inmates writing to staff must follow the chain of command noted in the inmate handbook. All three levels must be exhausted before writing to the Warden or filing an Inmate Complaint.

> The ICE is also directing you to provide this office with written documentation of your attempts to resolve the issue as directed. Written communication means responses to interview requests and other written responses from the staff contacted.

> If you have attempted to resolve the issue through the persons(s) indicated above and have not been able to do so, you may submit your complaint (with all pertinent documentation) for processing by this office within 14 calendar days of the date of this return letter.

(Id.)

On December 24, 2012, Sherman resubmitted his offender complaint. Along with his complaint, Sherman included copies of Interview/Information Requests he allegedly

---

[2] Pursuant to Wis. Admin. Code § DOC 310.09(1)(e), offender complaints shall contain only one issue per complaint and shall clearly identify the issue. The ICE must return the complaint to the inmate unprocessed if the submission does not meet that requirement per Wis. Admin. Code § DOC 310.09(3). (Kemper Aff. ¶ 9.)

4

sent to the Warden's office and to Captain Weber, dated December 16, 2012.[3] (Kemper

Aff. ¶ 12; Rose Aff. Ex. 1001 at 9-10.)  Sherman's request to the Warden's Office states:

> On 12-3-12 I arrived in seg.  I did not receive a shower until 12-8-12.  My cell has poor ventilation & irritates my asthma.  It is also very cold & I'm only supplied with pants, underwear, & a T-shirt.  I have not received a comb (I have a pick), my holy books.  I received 2 sheets of paper and [illegible] on the 9th & 16th.  I have yet to receive my property from my unit despite speaking with Capt. Weber, Sgt. Witt, Lt. Suttle, & writing my unit Sgt. on 2 occasions & other staff.  Including some medical supplies.

(Id.)  Sherman's request to Captain Weber states:

> On 12-6-12 I informed you that I've been in seg. since the third & I had yet to receive a shower.  You replied that I wouldn't get one until the next shower day (8th).  I also informed you that I had yet to receive my medical supplies as well as my property from my unit.  I also complained of my vent being caulked over & you said to speak to the sergeant.  Please verify the above statement.

(Id.)  Sherman also claims that he sent an Information/Interview Request to Officer

Nabrzynski on December 16, 2012. (Compl., Ex. C, Dkt. No. 1-1 at 18.)    That

communication states:

> On 12-5-12 you informed me I was ineligible for a shower, despite my statement that I got here on the 3rd.  I also complained of my vent being caulked up & not having my property from my unit yet, also medications. Please verify the above statement.

(Id.)

On December 27, 2012, ICE Padgett returned Sherman's offender complaint to him.

She returned the materials because:

---

[3] Warden Kemper does not have documentation that the Warden's office received any requests from Sherman to resolve his issues during his TLU placement. (Kemper Aff. ¶ 13.)

5

You are no longer on this unit thus these issued cited are moot. Any further issues regarding the segregation unit the ICE would direct you to contact Security Director Aldana as the next step in the chain of command.

The ICE would also direct complainant to HSU for any ongoing medical issues he may have.

(Kemper Aff. ¶ 14; Compl., Ex. C, Dkt. No. 1-1 at 7.)

On January 8, 2013, Sherman resubmitted his offender complaint and this time the ICE office filed it as Offender Complaint RCI-2013-838. Along with his complaint, Sherman submitted an Interview/Information Request which he allegedly sent to Security Director Alana on December 28, 2012, to which he received no response. (Kemper Aff. ¶ 15; Rose Aff. Ex. 1001 at 11-12.) In that communication, Sherman stated:

On 12-3-12 I was placed in seg, on 12-5-12 I did not receive a shower. On 12-6-12 I spoke with Captain Weber about myself not receiving a shower & ventilation & not having my holy books. I filed a complaint & it was returned to me & directed me to contact in writing Captain Weber. I did so. I then refiled my complaint, again it was returned stating that my complaint was moot since I'm no longer on the unit. It also said to contact you, Mr. Aldana, as the next step in chain of command. I received my shower on 12-8-12 outside 1 every 4 day requirement. I was in TLU for 15 days and did not receive my holy books or other requirements despite making several requests to Capt. Weber, Lt. Suttle, Sgt. Witt & my unit on 2 occasions.

(Id.)

On January 14, 2013, ICE Brenda LaBelle rejected Offender Complaint RCI-2013-838 as untimely. (Kemper Aff. ¶ 16; Rose Aff. Ex. 1001 at 2.) The ICE Rejection form provides the following "Brief Summary" of the offender complaint, "Not provided a shower in segregation from 12/3/12-12/8/12." Id. The form includes the following "Rejection Comment":

Pursuant to DOC 310.10.11(5)(d), the "inmate submitted the complaint beyond 14 calendar days from the date of the occurrence giving rise to the complaint and provides no good cause for the ICE to extend the time lines."

6

The complainant has had knowledge of this issue since 12-05-12. He provides no information to demonstrate a concerted effort to resolve the issue via proper chain-of-command in a timely manner, despite directive(s) from this office to do so on 12-12-12 and 12-27-12.

Id.

Sherman appealed the rejection of RCI-2013-838. He submitted a Request for Review of Rejected Complaint form dated January 18, 2013, which the Warden's office received on January 23, 2013. (Kemper Aff. ¶ 18; Rose Aff. Ex. 1001 at 13.) Sherman's request for review states:

Complaint was rejected on basis of allegedly not filing within the 14 day time limit. This is in error. The history of complaint 2013-838 is as follows:

12-5-12: I was denied a shower & had yet to receive some property including religious texts.

12-6-12: I filed my complaint. It was received & stamped Dec 11 2012.

12-12-12: Complaint returned & directed to contact Capt. Weber. I also sent a request to Security Director Aldana regarding my allowed TLU property having yet to be received: Response given.

12-16-12: I sent requests to: C/O Nabrinski, Warden's Office, & Capt. Weber, above & beyond the ICRS office's requests to adhere to chain of command. No responses were given.

12-26-12: Complaint re-received & stamped by ICRS Dec 26 2012.

12-27-12: Complaint returned & directed to contact Security Director Aldana.

12-28-12: Sent request form to Security Director Aldana: No response given.

1-8-13: Complaint received & dated Jan 8 2013: complaint acknowledged.

1-14-13: Complaint rejected based falsely on 14 day time limit.

As you can see complaint was dated & acknowledged 12-12-12, 12-26-12, & 1-8-13. All within 14 day time limit. Copies of my request forms were included in complaint to show following of chain of command.

7

(Rose Aff. Ex. 1001 at 13.) On February 1, 2013, Warden Kemper decided that RCI-2013-838 was appropriately rejected as untimely pursuant to Wis. Admin. Code § DOC 310.11(5) because Sherman filed it "[b]eyond the 14 calendar day limit." (Kemper Aff. ¶ 19; Rose Aff. Ex. 1001 at 5.)

Sherman has not filed any offender complaints under the ICRS regarding his allegations that he did not receive his religious text or holy book during his second stay in TLU, from February 15 through March 1, 2013.

**C. Religious Textbooks in Segregation**

Sherman is a Pagan Wiccan. His religious text is a "Book of Shadows" in a three-and-one-half-inch wide expandable file folder measuring approximately fourteen and three-fourth inches long and approximately nine inches tall. On the outside lip, printed largely was, "Book of Shadows." It contained approximately 800 loose sheets of paper not bound, including a majority of hand-written pages copied from the "Inner Temple of Witch Craft" by C. Penczak, published by Llewellyn Publications, A Division of Llewellyn Worldwide Ltd. (Bachhuber Aff., Ex. 1006, ¶ 8.)

Inmates are allowed religious textbooks in TLU. Any approved religious textbook can be delivered to an inmate. It is not often that inmates would receive their religious textbook from the initial pack-up. Sometimes unit staff will send a religious textbook from the inmate's former unit when the inmate's property is packed and inventoried on the unit; other times the inmate may have to request his religious textbook from the unit. It is possible for an inmate to receive his religious text without requesting it, for instance if the staff gathering the TLU property knows that the inmate regularly reads his religious text.

There are no requirements or policies that state an inmate must receive their religious textbook within a certain amount of time upon placement in TLU.

On December 3, 2012, Sherman signed the TLU/ADJ Property Allowed form. The form specifically indicates that one religious text is allowed and that it is the responsibility of the inmate to supply it if he wishes to possess it. (Padgett Aff. Ex. 1005.) Sherman did not identify by name or describe the appearance of his religious text in the Interview/Information Requests he sent to any of the defendants during his placement in TLU between December 3 and December 18, 2012. (Compl. Ex. B, Dkt. No. 1-1 at 15-18.) Sherman avers that he "did speak with several staff members in TLU including defendants Nabrzynski, Witt, and Weber, about receiving my Book of Shadows from my property and described its appearance to them." (Sherman Decl. ¶ 17, Dkt. 67.)

**D. Shower Procedure in Segregation Unit**

The RCI Waukesha Segregation Unit provides inmates the opportunity to take three ten-minute showers per week, on Monday, Wednesday, and Saturday. At the beginning of shower time, a sergeant or officer goes to each cell and asks each inmate if he would like a shower. If the inmate does, a showering protocol is followed where all inmates who are showering must stand at their cell front. They are then placed in handcuffs and searched before being escorted from their cell to the shower cell.

Inmates may bring the following items to the showers: soap, shampoo, conditioner, washcloth, towel, and pair of shower shoes. Inmates may exchange a clean washcloth and towel every shower day. They may request a new bar of soap once they are in the shower from the sergeant or officer conducting showers. Inmates may also request a bar of soap on unit supply days, which are Tuesday, Thursday, and Sunday. Dirty clothing is

9

exchanged and clean clothing is issued on all shower days at the time the inmate showers. If an inmate refuses to shower, he is still offered a change of clothing, a clean towel, a washcloth, and a bar of soap.

Sherman was placed in TLU from December 3, 2012, until December 18, 2012. He alleges that he did not receive a shower from when he was placed in TLU at 1500 hours (3:00 p.m.) on December 3, 2012, until December 8, 2012. (Compl. 4; Witt Decl. ¶ 7.) Showers were completed at 1620 hours (4:20 p.m.) on December 3, 2012. It is likely that Sherman arrived in the unit after showers already started for that day. During Sherman's placement in TLU, showers were offered on 2nd shift on December 5, 8, 10, 12, 15, and 17, 2012. (Witt Decl. ¶ 10; Padgett Aff. Ex. 1004.)

Sergeant Witt does not have knowledge as to why Sherman would not have received a shower until December 8, 2012, as he does not specifically recall the time period or the alleged incident. Sergeant Witt does not have any personal involvement in any decisions regarding the direct medical health care of inmates, including Sherman.

Sherman submitted a Health Service Request, dated December 6, 2012, wherein he requested daily showers for his eczema and back pain. Nurse Travis Brady responded on December 13, 2012, that Sherman did not meet the criteria for extra showers. (Compl. Ex. A, Dkt. No. 1-1 at 3.) A medical progress note from January 1, 2013, states that Sherman should decrease bathing to every other day and avoid prolonged showering as part of his plan for skin care. (Compl., Ex. A, Dkt. No. 1-1 at 2.)

**E. Temperature in Segregation Unit**

Pursuant to the State Department of Administration Facilities Division – Building Tenant Manual: Rules and Information for State Agency Building Occupants in State

10

Owned and Managed Buildings & Facilities (January 2013), "Every effort is made to provide an even temperature and acceptable working environment throughout the building." It also states, "Occupied space temperatures are maintained at a maximum of 68° F. Exceptions are granted to resident . . . prison cells, research facilities, data processing and computer rooms, print shops, and special areas where temperature and humidity are critical." (Kemper Aff. ¶ 21; http://doa.wi.gov/documents/DFM/Building%20Tenant%20Manual%20Updated%20January%202013.pdf ). RCI is consistent in following the temperature standard set forth in the State Department of Administration Facilities Division – Building Tenant Manual: Rules and Information for State Agency Building Occupants in State Owned and Managed Buildings & Facilities (January 2013). (Kemper Aff. ¶ 21; http://doa.wi.gov/documents/DFM/Building%20Tenant%20Manual%20Updated%20January%202013.pdf ).

Sherman did not complain about inadequate temperature or ventilation in any of the health service requests he submitted during his stay in TLU between December 3, 2012, and December 18, 2012. (Compl. Ex. A, Dkt. No. 1-1 at 3-4.) Sherman did not mention any issues with his asthma in the health service requests he submitted during his December 3 through December 18, 2012 stay in TLU. (Id.)

### III. DISCUSSION

The defendants contend that Sherman has failed to exhaust his administrative remedies as to all claims. They also contend that they are entitled to judgment on the merits of Sherman's claims.

**A. Exhaustion of Administrative Remedies**

11

The defendants contend that Sherman failed to exhaust administrative remedies because he failed to timely file his offender complaint for his first stay in TLU, and because he failed to file any offender complaint related to his second TLU stay. Sherman, on the other hand, contends that his offender complaint was erroneously rejected as untimely and that the defendants effectively prevented him from exhausting. He also contends that he did not need to file another offender complaint with respect to the denial of his religious text during his second stay in TLU because it was a "continuing violation."

"No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is a condition precedent to suit. Dixon v. Page, 291 F.3d 485, 488 (7th Cir. 2002) (citing Perez v. Wis. Dep't of Corr., 182 F.3d 532, 535 (7th Cir. 1999)). Section 1997e applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).

The Prison Litigation Reform Act requires "proper exhaustion," meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines. Woodford v. Ngo, 548 U.S. 81, 88, 93 (2006). "[W]hen administrative procedures are clearly laid out . . . an inmate must comply with them in order to exhaust his remedies." Pavey v. Conley, 663 F.3d 899, 905 (7th Cir. 2011). On the other hand, when jail personnel mislead an inmate about how to invoke the procedure the inmate cannot be blamed for failing to invoke it. Swisher v. Porter Cnty. Sheriff's Dep't, 769 F.3d 553, 555 (7th Cir. 2014) (citations omitted) (jail officials invited

12

inmate's noncompliance with grievance procedures, and thus he sufficiently exhausted administrative remedies, in § 1983 action alleging denial of medical care, by asking senior jail officers, up to and including the warden, about how to file a grievance; inmate was told not to file a grievance because the officers understood his problem and would resolve it without need for invocation of a formal grievance procedure, but those informal resolution procedures were not successful and officials did not tell inmate how to invoke a formal grievance process).

Inmates are not required to exhaust all administrative remedies – only those that are available. Woodford, 548 U.S. at 102. Prisons "may not take unfair advantage of the exhaustion requirement" and "a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." Dole v. Chandler, 438 F.3d 804, 809 (7th Cir. 2006). Thus, when prison officials thwart inmates from exhausting, "the process that exists on paper becomes unavailable in reality." Kaba v. Stepp, 458 F.3d 678, 684 (7th Cir. 2006).

Here, contrary to the defendants' assertions, the undisputed facts show that complaint RCI-2013-838 was timely filed. Sherman first submitted his offender complaint on December 6, 2012. On December 12, 2012, the ICE returned the complaint because it contained more than one issue. The ICE also directed Sherman to follow the "chain of command" by writing to staff about his issues and, if necessary, to resubmit the complaint within fourteen days. Sherman resubmitted his complaint within fourteen days, on December 24, 2012, and, as directed, included documentation that he wrote to staff. On December 27, 2012, the ICE again return the complaint and this time stated that Sherman's issues were moot because he was no longer in TLU. The ICE also stated that

13

Sherman should contact Security Director Aldana as the next step in the chain of command. Sherman resubmitted his complaint on January 8, 2013, and included documentation that he had attempted to contact Aldana, but received no response. The ICE filed the offender complaint as RCI-2013-838 and rejected it as untimely. The ICE's rejection comment inexplicably states that Sherman did not, "demonstrate a concerted effort to resolve the issue via proper chain-of-command in a timely manner[.]" However, as set forth above, Sherman did just that, that is, he followed the ICE's directions regarding the chain of command and he did so in a timely manner. It is unclear what more Sherman could have done. Thus, it appears to the court that Sherman has exhausted administrative remedies as to the issues raised in RCI-2013-838. See Swisher, 769 F.3d at 555.

Defendants contend that Sherman also did not follow the ICE's directions because he did not resubmit the offender complaint with only one issue. Sherman disagrees with the characterization of his offender complaint as containing more than one issue. According to Sherman, he did complain of only one issue: his conditions of confinement in TLU. I do not need to determine whether the offender complaint contained more than one issue or not because, although the ICE returned Sherman's initial December 6, 2012, submission of his offender complaint based, in part, on the complaint containing more than one issue, the ICE did not return or reject the complaint on that basis the two other times he submitted the same complaint. At the time the ICE actually accepted and filed the complant as RCI-2013-338, the ICE characterized the entire complaint (which complained of no shower; inadequate ventilation; no holy book, no small comb, no adequate clothing, no writing materials or stamps; conditions causing asthma and eczema to worsen) as, "Not provided a shower in segregation from 12/3/12-12/8/12," and rejected it as untimely. The

14

fact that the ICE did not reject RCI-2013-838 as containing more than one issue and, instead, erroneously rejected it as untimely prohibits the defendants from rightly claiming that Sherman failed to exhaust by submitting a complaint containing multiple issues. See Conyers v. Abitz, 416 F.3d 580, 584-85 (7th Cir. 2005); Maddox v. Love, 655 F.3d 709, 722 (7th Cir. 2011).

The defendants also point to the fact that Sherman did not raise all of his issues in his appeal to the CCE after the ICE rejected RCI-2013-838. However, pursuant to Wis. Admin. Code § DOC 310.11(6), the reviewing authority only reviews the basis for the rejection of a rejected inmate complaint. The ICRS rules do not allow inmates to appeal the merits of a rejected inmate complaint.

Lastly, it is undisputed that Sherman did not file an offender complaint with regard to his claim that he did not receive his religious text during his second stay in TLU. Sherman contends that he was not required to file another offender complaint on this issue because it was just a continuation of the violation of his rights while in TLU. Prisoners "need not file multiple, successive grievances raising the same issue (such as prison conditions or policies) if the objectionable condition is continuing." Turley v. Rednour, 729 F.3d 645, 650 (7th Cir. 2013) (citations omitted). "Separate complaints about particular incidents are only required if the underlying facts or the complaints are different." Id. Sherman's first stay in TLU (December 3 - December 18, 2012) and his second stay in TLU (February 15 - March 1, 2013) involved similar durations in the TLU unit and both involved Sherman's alleged failure to obtain his holy text. However, each stay in TLU was a distinct event, and for this reason the facts underlying each complaint were different. No violation could be deemed to have been "continuing" between December 3, 2012 and

15

March 1, 2013.  Thus, Sherman's initial grievance did not exhaust his claim related to his religious text for his second stay in TLU.  All claims arising out of the second stay will be dismissed for lack of exhaustion.

**B. Religious Claims**

### 1. RLUIPA

Sherman has been released from prison.  RLUIPA does not allow for suits against prison officials in their individual capacity, <u>Nelson v. Miller</u>, 570 F.3d 868, 889 (7th Cir. 2009); <u>Sossamon v. Texas</u>, 563 U.S. 277, 131 S.Ct. 1651, 1662 (2011), and the defendants are immune from suit under § 1983 for monetary damages in their official capacities, <u>see</u> <u>Brown v. Budz</u>, 398 F.3d 904, 917-18 (7th Cir. 2005).  Thus, Sherman may only seek injunctive relief against the defendants for his RLUIPA claim.  However, because Sherman is no longer incarcerated, his claims for injunctive relief are moot.  <u>See</u> <u>Ortiz v. Downey</u>, 561 F.3d 664, 668 (7th Cir. 2009).  Sherman has not shown a realistic possibility that he will again be incarcerated in the same state facility and therefore be subject to the actions of which he complains here.  As such, "[a]ny relief that [ ] judgment might permit would be purely speculative in nature."  <u>See</u> <u>id.</u>  Because Sherman has no claim to injunctive relief in light of his release, he cannot seek relief under RLUIPA.  <u>See</u> <u>Maddox v. Love</u>, 655 F.3d 709, 716-17 (7th Cir. 2011).[4]

### 2. First Amendment Free Exercise Claim

---

[4] Sherman contends that his claims are not moot because RCI's practices effect other inmates at RCI.  However, this case involves only Sherman's claims, not those of other inmates.

The defendants contend that they are entitled to summary judgment on Sherman's free exercise claim because there is no evidence to support that they imposed a substantial burden on his religious practice. According to defendants, Sherman knew that it was his responsibility to supply his holy book to the officers packing his belongings for his placement in TLU. (DPFOF ¶¶ 70-71.) The defendants charge that Sherman failed to properly identify the text and request it from his unit. The defendants also contend that the restrictions on property in TLU are pursuant to a rule of general applicability and that at RCI, all inmates placed in TLU are responsible to supply their religious texts if they wish to possess it.

Sherman claims that the denial of his religious text, Book of Shadows, during his two stays in TLU violated his rights under the First Amendment. He contends that the defendants knew or should have know that depriving him of his holy book substantially burdened his religion. He asserts that defendants' practice of requiring inmates placed in TLU to supply their personal religious texts is enforced arbitrarily. Sherman contends that his claims are factually supported and that he requested his religious text from his property, and that the defendants did not respond to his requests. Sherman contends that defendants violated the law when they violated their own policies and procedures and they should be held liable for doing so.

> Prisons must permit inmates the reasonable opportunity to exercise religious freedom. Cruz, 405 U.S. at 322 & n. 2, 92 S.Ct. 1079. However, prison restrictions that infringe on an inmate's exercise of his religion are permissible if they are reasonably related to a legitimate penological objective, such as security and economic concerns. See Turner v. Safley, 482 U.S. 78, 89-91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (listing factors relevant in determining whether the "reasonableness" test has been met); see also Al–Alamin v. Gramley, 926 F.2d 680, 686 (7th Cir.1991). The court must balance Maddox's right to be afforded a reasonable opportunity to

exercise the religious freedom guaranteed by the First and Fourteenth Amendments against the legitimate penological goals of the prison. See Young, 922 F.2d at 374. Within these confines, a prison is required to make "only reasonable efforts" to provide "some opportunity" for religious practice. Alston v. DeBruyn, 13 F.3d 1036, 1040–41 (7th Cir. 1994). This test is less restrictive than that ordinarily applied to infringements on constitutional rights in consideration of the need to give appropriate deference to prison officials, avoiding unnecessary judicial intrusion into security problems and other prison concerns. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348-49, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

"In providing this opportunity, the efforts of prison administrators, when assessed in their totality, must be evenhanded." Al–Alamin, 926 F.2d at 686. Prisons cannot discriminate against a particular religion "except to the extent required by the exigencies of prison administration." Johnson–Bey, 863 F.2d at 1312. "The rights of inmates belonging to minority or non-traditional religions must be respected to the same degree as the rights of those belonging to larger and more traditional denominations. Of course, economic and, at times, security constraints may require that the needs of inmates adhering to one faith be accommodated differently from those adhering to another." Al–Alamin, 926 F.2d at 686. "[T]he treatment of all inmates must be qualitatively comparable." Id.; see, e.g., Williams v. Lane, 851 F.2d 867, 885 (7th Cir. 1988) (affirming trial court's determination after bench trial that defendants violated protective custody inmates' First Amendment rights by denying them, but not general population inmates, opportunities for regular communal worship, religious instruction, and private religious counseling without legitimate penological interests).

Maddox v. Love, 655 F.3d 709, 719-20 (7th Cir. 2011).

It is undisputed that inmates in TLU are allowed religious textbooks and that any approved religious textbook can be delivered to an inmate. On December 3, 2012, the day that Sherman was first placed in TLU, he signed the TLU/ADJ Property Allowed form which states that one religious text is allowed and it is "the responsibility of the Offender to supply if he wishes to possess it." (Padgett Aff. Ex. 1005.) Sherman's religious text was not packed with him when he was transferred to TLU so he was already in TLU when he requested it. It appears that TLU inmates may "supply" their property by properly identifying it and requesting it from the unit.

18

It is undisputed that Sherman requested his religious text in his Interview/Information Requests to the Warden's Office. That request does not state the name of the text; it only states that Sherman has not received his "holy books." Sherman's other Interview/Information Requests state only that he has not received his "property" from his unit; they do not reference religious texts. Sherman's request to the Warden's Office was made on December 16, 2012, which was two days before he was released from TLU. Although Sherman avers that he "did speak with several staff members in TLU including defendants Nabrzynksi, Witt, and Weber about receiving my Book of Shadows from my property," he does not specify when he spoke with those officials. At most, these facts suggest the prison officials neglected to follow up with Sherman regarding the transfer of some of his property, including his religious text, to TLU. The facts do not, however, support a finding that any defendant violated Sherman's constitutional rights.

### 3. Equal Protection Claim

Sherman's equal protection claim involves the same set of facts implicated in his free exercise allegations, and it would be redundant even if he could establish a claim. See Conyers v. Abitz, 416 F.3d 580, 586 (7th Cir. 2005) (dismissing equal protection and Eighth Amendment claims based on same circumstances as free exercise claim because free exercise claim "gains nothing by attracting additional constitutional labels"); see also Graham v. Connor, 490 U.S. 386, 395 (1989). Accordingly, I will grant defendants' motion for summary judgment as to Sherman's equal protection claim.[5]

_____

[5] In his declaration, Sherman includes clarifications of declarations as to two inmates who aver the Pagan Wiccan inmates' opportunities to exercise their religion are not equal to those of other religions. For example, the inmates allege that Pagan Wiccan inmates do not have the funding for things they need, do not have as many books as Christians,

**C. Conditions of Confinement**

The defendants contend that Sherman's conditions of confinement claim fails because he was not subjected to conditions that violate contemporary standards of decency and because none of the defendants were deliberately indifferent. Sherman contends that he was denied the minimal civilized measure of life's necessities when RCI staff failed to provide him with a shower for five days while in TLU, and failed to provide him with a clean environment in his cell. According to Sherman, biweekly showers, or once every four days, is the accepted minimal measure of life's necessities.

Limiting inmates to weekly showers does not violate the Constitution. Jaros v. Ill. Dep't of Corr., 684 F.3d 667, 671 (7th Cir. 2012) (citing Rodriguez v. Briley, 403 F.3d 952, 952 (7th Cir. 2005); see also Henderson v. Lane, 979 F.2d. 466, 468-69 (7th Cir. 1992); Davenport v. DeRobertis, 844 F.2d 1310, 1316 (7th Cir. 1988). Sherman contends that his situation is distinguishable from the above-cited cases because his eczema skin condition made the lack of shower harmful to his health. However, Sherman has not submitted evidence supporting this assertion. In fact, the scant evidence in the record regarding Sherman's skin condition reflects that medical staff recommended him to limit his exposure to water based on his eczema. (Compl., Ex. A, Dkt. No. 1-1 at 2, 3.)

Turning to Sherman's claim regarding the lack of proper ventilation or heat in his cell resulting in aggravation to his asthma, he has not provided admissible evidence to support this claim. Rather, the facts show that RCI follows regular standards regarding prison

---

and do not have as many feasts as Christians (once per week versus once per month). (Dkt. No. 67.) These allegations do not change the analysis with respect to Sherman's claims regarding his religious text during his two stays in TLU.

temperatures. Sherman did not complain about inadequate temperatures, ventilation, or issues with his asthma in any of the health service requests he submitted between December 3 and December 18, 2012. In short, the facts do not support a claim that any defendant violated Sherman's constitutional rights regarding this claim.

## IV. ADDITIONAL MATTER

Sherman has filed a second motion to compel discovery. (Dkt. No. 71.) He seeks segregation camera footage as requested in his production of document request 7. He also seeks, "for inspection and photography, cells in which the incidents occurred, as well as heating and cooling, and ventilation units and duct" as requested in his production of document request 8. (Dkt. No. 71-1 at 7.) The defendants oppose the motion because Sherman did not comply with the requirement to confer in good faith prior to filing a motion to compel, <u>see</u> Civil L.R. 37 (E.D. Wis.).

Even if Sherman had conferred with defendants, I have reviewed defendants' responses to the discovery requests and they are reasonable. First, defendants did not provide camera footage sought in request 7 because there is no such segregation camera footage. Second, I agree with defendants' objections to request 8 that the discovery request is vague and ambiguous, overly broad, and not reasonably calculated to lead to the discovery of admissible evidence.

## V. CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion for summary judgment (Docket 30) is **GRANTED**. Plaintiffs' RLUIPA claims are dismissed as moot, and all other claims are dismissed on their merits.

21

**IT IS FURTHER ORDERED** that plaintiff's motion to compel (Docket 71) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 8th day of September, 2015.

s/ Lynn Adelman

_____

LYNN ADELMAN
District Judge